**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MACOMB COUNTY RETIREE HEALTH CARE FUND, Individually and on behalf of all others similarly situated, | Civil Action No: |
| Plaintiff, | |
| v. | DEMAND FOR JURY TRIAL |
| PDD HOLDINGS INC. F/K/A PINDUODUO INC., LEI CHEN, JIAZHEN ZHAO, JING MA, and JUN LIU, | <u>CLASS ACTION</u> |
| Defendants. | |

**CLASS ACTION COMPLAINT FOR VIOLATION**
**OF THE FEDERAL SECURITIES LAWS**

Plaintiff Macomb County Retiree Health Care Fund ("Plaintiff"), individually and on behalf of all others similarly situated, by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (1) regulatory submissions filed by PDD Holdings Inc., formerly known as Pinduoduo Inc. ("PDD" or the "Company"), with the United States Securities and Exchange Commission (the "SEC"); (2) press releases and media reports issued and disseminated by the Company; (3) analyst and media reports concerning the Company; and (4) other public information regarding the Company, including statements made by PDD

executives.[1]  Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.  This is a federal securities class action on behalf of all investors who purchased or otherwise acquired PDD securities between April 30, 2021 and August 23, 2024, inclusive (the "Class Period").  The claims asserted herein are alleged against PDD, its Chairman and Co-Chief Executive Officer, Lei Chen ("Chen"), its Co-Chief Executive Officer Jiazhen Zhao ("Zhao"), its Vice President of Finance until January 1, 2022, Jing Ma ("Ma"), and its Vice President of Finance from January 2022 to the present, Jun Liu ("Liu") ("collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.  PDD operates the online marketplaces Pinduoduo and Temu, which allow Chinese merchants to sell goods to consumers around the world.  Throughout the Class Period, PDD touted its growth while concealing several factors that rendered this growth unsustainable and posed substantial risks to PDD's business, including: (a) merchant policies that made it unprofitable for vendors to do business on PDD platforms while allowing PDD to grow revenues and save on operational costs; (b) malware issues on PDD applications that exploited customers and obtained user data without consent, including accessing sensitive information; (c) PDD's failure to implement effective compliance systems, including a system to prevent goods made by forced labor from being sold on its platform; and (d) that, due to the foregoing, PDD faced undisclosed risks of poor merchant and customer relations as the platforms scaled, which

---

[1]  Emphasis has been added unless otherwise noted.

ultimately led to hundreds of millions of dollars in fees returned to merchants, merchants defecting to competing sites, and the slowing growth of its customer base.

3.     Defendants' fraud began to be revealed on March 22, 2023, when news outlets reported that PDD platforms can bypass users' cell phone security to monitor activity in other apps, check notifications, read private messages, and change settings.   On this news, the price of PDD ADSs (defined below) fell $3.35, or more than 4 percent, to close at $75.58 on March 22, 2023.

4.     Then, on July 30, 2024, media reported that hundreds of merchants had begun protesting at the Pinduoduo office in southern China, demanding PDD refund penalties they say were imposed arbitrarily.   On this news, the price of PDD ADSs fell $4.43, or more than 3.5 percent, to close at $123.16 on July 30, 2024.

5.     Finally, on August 26, 2024, PDD disclosed its quarterly results for the second quarter of 2024, announced that it had decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and stated that it expects that future profitability will be weighed down by a reduction in transaction fees for high quality merchants to drive the "high-quality development" of its merchant ecosystem.   On this news, the price of PDD ADSs fell $39.87, or 29 percent, to close at $100.00 on August 26, 2024.

6.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.     Venue is proper here pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in this District.

10.     The Company has submitted to personal jurisdiction in the City of New York.   The Company's latest annual report, filed with the SEC on Form 20-F on April 25, 2024, stated that, as per the Company's deposit agreements, federal or state courts in the City of New York have exclusive jurisdiction to determine claims arising under its deposit agreements.   It specifically stated the following:

> ***ADSs holders may not be entitled to a jury trial with respect to claims arising under the deposit agreements, which could result in less favorable outcomes to the plaintiff(s) in any such action.***
>
> The deposit agreements governing the ADSs representing our ordinary shares provide that, subject to the depositary's right to require a claim to be submitted to arbitration, ***the federal or state courts in the City of New York have exclusive jurisdiction to hear and determine claims arising under the deposit agreements and in that regard, to the fullest extent permitted by law, ADS holders waive the right to a jury trial of any claim they may have against us or the depositary arising out of or relating to our shares, the ADSs or the deposit agreements, including any claim under the U.S. federal securities laws***.

11.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined above), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Plaintiff purchased PDD securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud.   Plaintiff's certification evidencing the relevant transactions in PDD is attached hereto.

13.     PDD is a Cayman Islands corporation with its principal executive offices located at 25 St Stephen's Green, Dublin 2, D02 XF99, Ireland.   During the Class Period, the Company's American Depositary Shares ("ADS" or "ADSs") traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "PDD."   It conducts its businesses through operating entities in various jurisdictions around the world.

14.     Defendant Chen served as the Company's Chief Executive Officer ("CEO") from July 2020 through April 2023, and since then as co-CEO.   Chen is also the current chairman of the Board of Directors (the "Board").

15.     Defendant Zhou is a founding member of PDD, served as a senior vice president from the beginning of the Class Period to April 2023, and thereafter as co-CEO and member of the Board.

16.     Defendant Ma served as the Company's Vice President of Finance from the beginning of the Class Period until January 1, 2022.

17.     Defendant Liu has served as the Company's Vice President of Finance from January 2022 to the present.

18.     Defendants Chen, Zhou, Ma, and Liu are sometimes referred to herein as the "Individual Defendants."

19.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of PDD's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.   Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their

positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

20. The Company is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

21. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to PDD under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

22. PDD is a multinational commerce group that owns and operates a portfolio of businesses, including Chinese online retailer Pinduoduo and the Boston, Massachusetts-based e-commerce platform Temu, which allows Chinese vendors to sell and ship directly to customers across the globe without having to rely on intermediate distributors in the destination country.

23. The Pinduoduo platform pioneered the "team purchase" model, in which buyers are encouraged to share product information on social networks, and invite their friends, family and social contacts to form shopping teams to enjoy the more attractive prices. Pinduoduo's buyer base helps attract merchants to the platform, while the scale of the platform's sales volume encourages merchants to offer more competitive prices and customized products and services to buyers.

24.     Temu was founded in September 2022.   In its early stages of development, Temu aspires to become a global online platform that "empowers merchants" in partnership with a global network of logistics vendors and fulfillment partners.

**Materially False and Misleading
Statements Issued During the Class Period**

25.     On April 30, 2021, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2020 (the "2020 Annual Report").   Attached to the 2020 Annual Report were signed certifications pursuant to SOX signed by Defendant Chen and Ma attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

26.     The 2020 Annual Report contained the following risk disclosure about PDD's relationship with merchants:

> ***If we fail to maintain and expand our relationships with merchants, our revenues and results of operations will be harmed.*** [Emphasis in original.]
>
> ***We rely on our merchants to offer merchandise that appeal to our existing and potential buyers at attractive prices.   Our ability to provide popular products on our platform at attractive prices depends on our ability to develop mutually beneficial relationships with our merchants***. …To date, our buyers and merchants have been increasing in parallel as a result of the powerful network effects of our platform.   However, we may experience merchant attrition in the ordinary course of business resulting from several factors, such as losses to competitors, perception that marketing on our platform is ineffective, reduction in merchants' marketing budgets, and closures or bankruptcies of merchants.   In addition, ***we may have disputes with merchants with respect to their compliance with our quality control policies and measures and the penalties imposed by us for violation of these policies or measures from time to time, which may cause them to be dissatisfied with our platform***.   Their complaints may in turn result in negative impact on our public image and reputation.   ***If we experience significant merchant attrition, or if we are unable to attract new merchants, our revenues and results of operations may be materially and adversely affected.***

27.     The 2020 Annual Report also made the following statements concerning the use of merchant penalties for vendors selling on PDD platforms:

***[W]e implement strict policies and control measures aimed at ensuring the accuracy of product descriptions on our platform.***….After product information is posted, our system continues to monitor and conduct semantic analysis on buyer reviews, the results of which are used as inputs for evaluation of the associated merchant's compliance with our policies. ***If a merchant is found to have violated our policies, such merchant is required to compensate the buyers in accordance with the service agreement with the merchant on our platform.*** In addition to responding to buyer complaints, our dedicated merchandise control team also conducts sample test purchases to verify whether product descriptions match the products delivered. ***A merchant's record of compliance, together with other factors such as its sales volume and buyer feedback and reviews, is taken into account when our platform compiles such merchant's ranking, which may affect the level of exposure it receives on our platform and in turn may affect its sales volume.*** We invest in technical capabilities relating to keyword identification, filtering images, text and video recognition and the development of a blacklisting mechanism. ***We also reward merchants who sell high-quality products and provide superb services with preferential transaction services fee rates, as part of our continued efforts to improve user experience, thereby creating a virtuous cycle that attracts high-quality merchants and weeds out counterfeit and infringing goods***.

28.     The 2020 Annual Report also made the following statements concerning the importance of its relationship with merchants to PDD's operational results:

> ***In addition to the scale and engagement of active buyers, our growth is also driven by the scale of merchants on our platform.*** In 2020, the number of active merchants on our platform reached 8.6 million. Merchants are attracted to our platform by our large buyer base and scale of sales volume as well as targeted online marketing and other services provided by us. The increase in the number of active merchants leads to more competitive prices and broader product categories offered on our platform, which in turn helps us attract more buyers, generating powerful network effects.
>
> ***Our ability to provide popular products on our platform at attractive prices also depends on our ability to maintain mutually beneficial relationships with our merchants. For example, we rely on our merchants to make available sufficient inventory and fulfill large volumes of orders in an efficient and timely manner to ensure our user experience.*** To date, our buyers and merchants have been increasing in parallel as a result of the network effects of our platform.

29.     The 2020 Annual Report further contained the following risk disclosure about the Company's use of customer data:

> We have a data security team of engineers and technicians dedicated to protecting the security of our data. We have also adopted strict data protection policy to ensure the security of our proprietary data. ***We collect anonymized, non-confidential user behavior and pattern data based on their interactions with our platform through our social network partners, which have been pre-processed to exclude user identity or other***

***sensitive information.*** We encrypt confidential personal information we gather from our own platform. To ensure data security and avoid data leakage, we have established stringent internal protocols under which we grant classified access to confidential personal data only to limited employees with strictly defined and layered access authority. We strictly control and manage the use of data within our various departments and do not share data with external third parties, nor do we cooperate with third-party vendors in data analytics efforts.

30. The 2020 Annual Report further contained the following risk disclosure about the

Company's brand and reputation:

> We believe that the recognition and reputation of our Pinduoduo or "拼多多" brand among our buyers, merchants and third-party service providers have contributed significantly to the growth and success of our business. ***Maintaining and enhancing the recognition and reputation of our brand are critical to our business and competitiveness***. Many factors, some of which are beyond our control, are important to maintaining and enhancing our brand. These factors include our ability to:
>
> [. . .]
>
> - preserve our reputation and goodwill in the event of any negative publicity on our consumer experience or merchant service, ***internet and data security,*** product quality, price or authenticity, performance measures, or other issues affecting us or other e-commerce businesses in China.

31. The 2020 Annual Report contained the following risk disclosure about the improper

use of customer data:

> ***Our business generates and processes a large amount of data, and we are required to comply with PRC and other applicable laws relating to privacy and cyber security. The improper use or disclosure of data could have a material and adverse effect on our business and prospects.***
>
> Our business generates and processes a large quantity of data. We face risks inherent in handling and protecting large volume of data. In particular, we face a number of challenges relating to data from transactions and other activities on our platforms, including:
>
> - protecting the data in and hosted on our system, including against attacks on our system by outside parties or fraudulent behavior ***or improper use by our employees;***
>
> - addressing concerns related to privacy and sharing, safety, security and other factors; and

- ***complying with applicable laws, rules and regulations relating to the collection, use, storage, transfer, disclosure and security of personal information***, including any requests from regulatory and government authorities relating to these data.

[. . .]

Furthermore, we expect that data security and data protection compliance will receive greater attention and focus from regulators, as well as attract continued or greater public scrutiny and attention going forward, which could increase our compliance costs and subject us to heightened risks and challenges associated with data security and protection. ***If we are unable to manage these risks, we could become subject to penalties, including fines, suspension of business and revocation of required licenses, and our reputation and results of operations could be materially and adversely affected***.

32.     The 2020 Annual Report contained the following risk disclosure regarding the

failure to protect confidential information:

> ***Failure to protect confidential information of buyers, merchants and our network against security breaches could damage our reputation and brand and substantially harm our business and results of operations.*** [Emphasis in original.]

> A significant challenge to the e-commerce industry is the secure storage of confidential information and its secure transmission over public networks.    A majority of the orders and the payments for products offered on our platform are made through our mobile app.    In addition, all online payments for products sold on our platform are settled through third-party online payment services.    ***Maintaining complete security on our platform and systems for the storage and transmission of confidential or private information, such as buyers' personal information, payment-related information and transaction information, is essential to maintain consumer confidence in our platform and systems.***

> ***We have adopted strict security policies and measures, including encryption technology, to protect our proprietary data and buyer information.    However, advances in technology, the expertise of hackers, new discoveries in the field of cryptography or other events or developments could result in a compromise or breach of the technology that we use to protect confidential information.***

33.     On April 25, 2022, the Company filed with the SEC its Annual Report on Form 20-

F for the year ended December 31, 2021 (the "2021 Annual Report").    Attached to the 2021 Annual

Report were signed certifications pursuant to SOX signed by Defendants Chen and Liu  attesting

to the accuracy of financial reporting, the disclosure of any material changes to the Company's

internal controls over financial reporting, and the disclosure of all fraud.

34.     The 2021 Annual Report contained the following risk disclosure about the Company's brand and reputation:

> ***Any harm to our brand or reputation may materially and adversely affect our business and results of operations.***
>
> We believe that the recognition and reputation of our Pinduoduo or "拼多多" brand among our buyers, merchants and third-party service providers have contributed significantly to the growth and success of our business.   Maintaining and enhancing the recognition and reputation of our brand are critical to our business and competitiveness.   Many factors, some of which are beyond our control, are important to maintaining and enhancing our brand. These factors include our ability to:
>
> [. . .]
>
> - preserve our reputation and goodwill in the event of any negative publicity on our consumer experience or merchant service, ***internet and data security***, product quality, price or authenticity, performance measures, or other issues affecting us or other e-commerce businesses in China.

35.     The 2021 Annual Report contained the following risk disclosure about the improper use of data:

> ***Our business generates and processes a large amount of data, and we are required to comply with PRC and other applicable laws relating to privacy and cybersecurity.   The improper use or disclosure of data could have a material and adverse effect on our business and prospects.***
>
> Our business generates and processes a large amount of data.   We face risks inherent in handling and protecting them.   In particular, we face a number of challenges relating to data from transactions and other activities on our platforms, including:
>
> - protecting the data in and hosted on our system, including against attacks on our system by outside parties or fraudulent behavior ***or improper use by our employees***;
>
> - addressing concerns related to privacy and sharing, safety, security and other factors; and
>
> - ***complying with applicable laws and regulations relating to the collection, use, storage, transfer, disclosure and security of personal data***, including any requests from regulatory and government authorities relating to these data.

36.     The 2021 Annual Report contained the following risk disclosure regarding the failure to protect confidential information:

> A significant challenge to the e-commerce industry is the secure storage of confidential information and its secure transmission over public networks.   A majority of the orders and the payments for products offered on our platform are made through our mobile app.   In addition, all online payments for products sold on our platform are settled through third-party online payment services.   ***Maintaining complete security on our platform and systems for the storage and transmission of confidential or private information, such as buyers' personal information, payment-related information and transaction information, is essential to maintain consumer confidence in our platform and systems***.

37.     The 2021 Annual Report contained the following risk disclosure about scrutiny of the Company:

> ***We may increasingly become a target for public scrutiny, including complaints to regulatory agencies, negative media coverage, and public dissemination of malicious reports or accusations about our business, all of which could severely damage our reputation and materially and adversely affect our business and prospects.***

38.     The 2021 Annual Report contained the following risk disclosure regarding international trade policies:

> ***Changes in U.S. and international trade policies, particularly with regard to China, may adversely impact our business and operating results.***
>
> The U.S. government has recently proposed, among other actions, imposing new or higher tariffs on specified products imported from China to penalize China for what it characterizes as unfair trade practices and China has responded by proposing new or higher tariffs on specified products imported from the United States.   For example, in 2018, the United States announced three finalized tariffs that applied exclusively to products imported from China, totaling approximately US$250 billion, and in May 2019 the United States increased from 10% to 25% the rate of certain tariffs previously levied on Chinese products.   Trade tension between China and the United States may intensify, and the United States may adopt even more drastic measures in the future.   Although cross-border business may not be an area of our focus, if we plan to sell our products internationally in the future, any unfavorable government policies on international trade, such as capital controls or tariffs, may affect the demand for our products and services, impact the competitive position of our products or prevent us from being able to sell products in certain countries. If any new tariffs, legislation and/or regulations are implemented, or if existing trade agreements are renegotiated such changes could have an adverse effect on our business, financial condition, results of operations.   In addition, future actions or escalations by either the United States or China that affect trade relations may cause global economic turmoil and potentially have a negative impact on our business.

In addition, recent economic and trade sanctions threatened and/or imposed by the U.S. government on a number of China-based technology companies have raised concerns as to whether, in the future, there may be additional regulatory challenges or enhanced restrictions involving other China-based technology companies in areas such as data security, information technology or other business activities. Similar or more expansive restrictions that may be imposed by the U.S. or other jurisdictions in the future, may materially and adversely affect our ability to acquire technologies, systems or devices that may be important to our technology infrastructure, service offerings and business operations.

39. The statements contained in ¶¶ 25-38 were materially false and/or misleading because they touted PDD's growth while concealing several factors that rendered this growth unsustainable and posed substantial risks to PDD's business, including:

(a)     merchant policies that made it unprofitable for vendors to do business on PDD platforms while allowing PDD to grow revenues and save on operational costs;

(b)     malware issues on PDD applications that exploited customers and obtained user data without consent, including accessing sensitive information;

(c)     PDD's failure to implement effective compliance systems, including a system to prevent goods made by forced labor from being sold on its platform;

(d)     that, due to the foregoing, PDD faced an undisclosed risk of poor merchant and customer relations as the platforms scaled, which ultimately led to hundreds of millions of dollars in fees returned to merchants and merchants defecting to competing sites.

**THE TRUTH BEGINS TO EMERGE AS DEFENDANTS CONTINUE TO ISSUE FALSE AND MISLEADING STATEMENTS**

40. On March 21, 2023, after market hours, *Reuters* published an article entitled "Google suspends China's Pinduoduo app on security concerns." It stated the following:

*Google suspended the Play version of [PDD's] Pinduoduo app for security concerns, after malware issues were found on versions of the Chinese e-commerce app outside Google's app store*, a company spokesperson said on Tuesday.

*"Off-Play versions of this app that have been found to contain malware have been enforced on via Google Play Protect," the spokesperson said in a statement, adding that the Play version of the app has been suspended for security concerns.*

*Google Play Protect scans Android devices with Google Play Services for potentially harmful apps and works to prevent the installation of malicious apps.*

*"Google Play has informed us this morning that Pinduoduo App has been temporarily suspended as the current version is not compliant with Google's Policy, but has not shared more details," a Pinduoduo spokesperson said in an email to Reuters.*

There are several other apps that have been suspended by Google Play, Pinduoduo said, adding that there are multiple reasons an app is temporarily suspended. Google did not immediately respond to a query on the suspension of other apps on the Play store.

[ . . . ]

The development comes amid efforts by the U.S. government to bolster its cyber defenses in the face of a steady increase in hacking and digital crimes targeting the country.

The government recently announced a new cybersecurity strategy that named China and Russia as the most prominent threats to the United States.

41.     On this news, the price of PDD ADSs declined by $3.35 per share, or about 4%, to close at $75.58 on March 22, 2023. Despite this revelation, PDD continued to issue misleading statements regarding its prospects while concealing risks to its merchant and customer relations.

42.     On April 26, 2023, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were signed certifications pursuant to SOX signed by Defendants Chen and Liu attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

43.     The 2022 Annual Report contained the following risk disclosure about the Company's brand and reputation:

***Any harm to our brands or reputation may materially and adversely affect our business and results of operations.***

We believe that the recognition and reputation of our brands, including Pinduoduo and Temu, among our buyers, merchants and third-party service providers have contributed significantly to the growth and success of our business.   Maintaining and enhancing the recognition and reputation of our brands are critical to our business and competitiveness.

Many factors, some of which are beyond our control, are important to maintaining and enhancing our brands.   These factors include our ability to:

[. . .]

- preserve our reputation and goodwill in the event of any negative publicity on our consumer experience or merchant service, ***internet and data security***, product quality, price or authenticity, performance measures, or other issues affecting us or other e-commerce businesses in the countries or regions where we have operations.

44.     The 2022 Annual Report contained the following risk disclosure about the improper use of data:

***Our business generates and processes a large amount of data, and we are required to comply with applicable laws relating to privacy and cybersecurity.   The improper use or disclosure of data could have a material and adverse effect on our business and prospects.***

Our business generates and processes a large amount of data.   We face risks inherent in handling and protecting them.   In particular, we face a number of challenges relating to data from transactions and other activities on our platforms, including:

- protecting the data in and hosted on our system, including against attacks on our system by outside parties ***or fraudulent behavior or improper use by our employees***, and securely transmitting such data over public networks;

- addressing concerns related to privacy and sharing, ***safety, security and other factors***; and

- complying with applicable laws and regulations relating to the collection, use, storage, transfer, disclosure and security of personal data, including requests from regulatory and government authorities relating to these data.

To address these challenges, we have adopted strict security policies and measures, including encryption technology, to protect our proprietary data and buyer information.

*Maintaining complete security on our platforms and systems for the storage and transmission of confidential or private data, such as buyers' personal information, payment-related information and transaction information, is essential to maintain consumer confidence in our platforms and systems.*

However, advances in technology, the expertise of hackers, new discoveries in the field of cryptography or other events or developments could result in a compromise or breach of the technology that we use to protect our data.    We may not be able to prevent third parties, especially hackers or other individuals or entities engaging in similar activities through viruses, Trojan horses, malicious software, break-ins, phishing attacks, third-party manipulation or security breaches, from illegally obtaining the confidential or private data we hold on our platforms.    Individuals or entities that illegally obtain confidential or private data may further engage in various other illegal activities using such data.    The methods used by hackers and others engaging in illegal online activities are increasingly more sophisticated and constantly evolving.    In addition, all online payments for products sold on our platforms are settled through third-party online payment services.    We have limited control or influence over the security policies or measures adopted by third-party providers of online payment services through which some of our buyers may choose to make payment for purchases.

*Any negative publicity on our platforms' data safety or privacy protection mechanisms and policies, and any claims asserted against us or fines imposed upon us as a result of actual or perceived failures, could have a material and adverse effect on our public image, reputation, financial condition and results of operations.*    Any compromise of our information security or the information security measures of our contracted third-party online payment service providers that results in data being improperly used or disclosed could have a material and adverse effect on our reputation, business, prospects, financial condition and results of operations.    Significant capital, managerial and other resources, including costs incurred to deploy additional personnel and develop network protection technologies, train employees, and engage third-party experts and consultants, may be required to ensure and enhance information security or to address the issues caused by a potential security failure.

45.    The 2022 Annual Report contained the following risk disclosure about scrutiny of

the Company:

*We may increasingly become a target for public scrutiny and anti-competitive conducts of competitors or third parties with ill intent, including complaints to regulatory agencies, negative media coverage, and public dissemination of malicious reports or accusations about our business, all of which could severely damage our reputation and materially and adversely affect our business and prospects.*    [Emphasis in original.]

*We process an extremely large number of transactions on a daily basis on our platforms, and the high volume of transactions taking place on our platforms as well as publicity about our business create the possibility of heightened attention from the public, competitors, regulators and the media.*    Heightened regulatory and public concerns over

consumer protection and consumer safety issues may subject us to additional legal and social responsibilities and increased scrutiny and negative publicity over these issues, due to the large number of transactions that take place on our platform and the increasing scope of our overall business operations. In addition, changes in our services or policies have resulted and could result in objections by the public, our competitors, operators of traditional or new media and social networks, merchants on our platform or others. ***From time to time, these objections or allegations, regardless of their veracity, may result in consumer dissatisfaction, public protests or negative publicity, which could result in government inquiry or substantial harm to our brand, reputation and operations.***

46. The 2022 Annual Report contained substantially the same risk disclosure regarding

international trade policies as the 2021 Annual Report:

> ***Changes in U.S. and international trade policies, particularly with regard to China, may adversely impact our business and operating results.*** [Emphasis in original.]

> The U.S. government has proposed, among other actions, imposing new or higher tariffs on specified products imported from China to penalize China for what it characterizes as unfair trade practices and China has responded by proposing new or higher tariffs on specified products imported from the United States. For example, in 2018, the United States announced three finalized tariffs that applied exclusively to products imported from China, totaling approximately US$250 billion, and in May 2019 the United States increased from 10% to 25% the rate of certain tariffs previously levied on Chinese products. ***Trade tension between China and the United States may intensify, and the United States may adopt even more drastic measures in the future. Any unfavorable government policies on international trade, such as capital controls or tariffs, may affect the demand for our products and services, impact the competitive position of our products or prevent us from being able to sell products in certain countries***. If any new tariffs, legislation and/or regulations are implemented, or if existing trade agreements are renegotiated such changes could have an adverse effect on our business, financial condition, results of operations. In addition, future actions or escalations by either the United States or China that affect trade relations may cause global economic turmoil and potentially have a negative impact on our business.

47. The 2022 Annual Report contained the following risk disclosure about legal

compliance:

> ***Our business is subject to a large number of laws across many jurisdictions, many of which are evolving.*** [Emphasis in original.]

> [ . . .]

> ***We strive to comply with all applicable laws***, but they may conflict with each other, and by complying with the laws or regulations of one jurisdiction, we may find that we are violating the laws or regulations of another jurisdiction. ***Despite our efforts, we may not***

*have fully complied in the past and may not fully comply in the future, particularly where the applicable regulatory regimes have not been broadly interpreted* . . . .

48. On August 29, 2023, PDD held a conference call to discuss its financial results for the second quarter of 2023. During the question and answer portion of the call, Defendant Zhao made the following statement about its development of high-quality merchant relationships:

So, in short, growth this quarter can be attributed to two factors. The first is the positive industry trends, and **second is the early positive feedback toward our high-quality development strategy**.

[ . . .]

**With our 10 Billion Ecosystem Initiative, we also provide support to quality merchants and products. And this incentivizes them to improve product and service quality. I think this, in turn, promotes the healthy and high-quality development of our platform ecosystem. We received positive feedback from these efforts. And this gives us confidence to continue on this path of high-quality development.** Our strategy is very, very clear, but executing it well is not that easy. It actually requires a long-term commitment, and we will need to do the right things and also do things right. We will continue to stick to our benefit, improve ourselves in the face of competition and create a greater value.

49. Then, on June 22, 2023, The New York Times published an article entitled "Congress Spotlights 'Serious' Forced Labor Concerns With Chinese Shopping Sites", which discussed findings by the U.S. House of Representatives' Select Committee on the Chinese Communist Party (the "Committee"). The article noted that in 2022, "the U.S. imposed a ban on products from Xinjiang, citing the region's use of forced labor in factories and mines." It further stated the following about bipartisan findings from the U.S. House of Representatives regarding Temu and the flow of goods made with forced labor from Xinjiang into the United States:

Lawmakers are flagging what they say are **likely significant violations of U.S. Law by Temu**, a popular Chinese shopping platform, accusing it of providing an unchecked channel that allows goods made with forced labor to flow into the United States.

In a report released Thursday, **the House Select Committee on the Chinese Communist Party said Temu, a rapidly growing side that sells electronics, makeup, toys and clothing, had failed "to maintain even the façade of a meaningful compliance program"** for its

*supply chains and was likely shipping products made with forced labor into the United States on a "regular basis."*

The report stems from a continuing investigation into forced labor in supply chains that touch on China. Lawmakers said the report was based on responses submitted to the committee by Temu[.] The report offered a particularly scathing assessment of Temu, saying **there is an "extremely high risk that Temu's supply chains are contaminated with forced labor."**

[. . .]

**"Temu is doing next to nothing to keep its supply chains free from slave labor,"** said Representative Mike Gallagher, a Wisconsin Republican who heads the committee.

[. . .]

**Temu's "policy to not prohibit the sale of products that explicitly advertise their Xinjiang origins, even in the face of mounting congressional and public scrutiny on related topics, raises serious questions,"** the report said.

[. . .]

The congressional report also **criticized Temu's failure to set up a compliance or auditing system that could independently verify that its sellers were not sourcing products from Xinjiang**.

50.     Temu did not respond to a request for comment regarding this article.

51.     The Committee's report, which was also released on June 22, 2023, was entitled "Fast Fashion and the Uyghur Genocide: Interim Findings" (the "Committee Report"). As noted in the Committee Report, the Committee had requested information from Temu to assess its efforts to comply with the Uyghur Forced Labor Prevention Act (the "UFLPA"). Under the UFLPA, products originating from the Xinjiang region of China imported into the United States must be certified as not being produced by forced labor. The Committee Report stated the following:

**Temu does not have any system to ensure compliance with the Uyghur Forced Labor Prevention Act (UFLPA).** This all but guarantees that shipments from Temu containing products made with forced labor are entering the United States on a regular basis, in violation of the UFLPA.

[. . .]

Temu's business model . . . is to avoid bearing responsibility for compliance with the UFLPA and other prohibitions on forced labor.

[. . .]

Temu conducts no audits and reports no compliance system to affirmatively examine and ensure compliance with the UFLPA.

[. . .]

Temu's failure to take any meaningful steps with respect to preventing the importation of goods produced with forced labor is striking. Simply put, Temu denies responsibility for ensuring that its 80,000, mostly China-based sellers do not sell products produced with forced labor.

[. . .]

The sole measure that Temu reported that it takes to ensure that it is not selling goods produced with forced labor is to require its sellers to agree with its website's "Third Party Code of Conduct," which includes boilerplate language that the company has "a zero-tolerance policy" for the use of forced, indentured, or penal labor. It makes no mention of Xinjiang, the UFLPA, or any other provision of law.

[. . .]

Temu also does not have an auditing or compliance program to determine whether its suppliers are compliant with the Code of Conduct or to verify whether its China-based sellers are in fact complying with the UFLPA and other prohibitions under U.S. law.

52. On November 28, 2023, PDD held a conference call to discuss its financial results for the third quarter of 2023. In opening remarks, Defendant Chen made the following statement about the effect of high-quality merchant relationships on revenue and profitability:

In Q3, we achieved a total revenue of RMB68.8 billion, representing a 94% year-on-year increase. ***This is a result of the improving consumer sentiment and our efforts to carrying out the high-quality development strategy***.

As Lei mentioned earlier, our financial performance this quarter is the combined result of improving consumer sentiment and the execution of our high-quality development strategy.

On the supply side, we remain firmly rooted in the real economy, driving industrial modernization through innovation. ***On platform ecosystem, we are allocating more resources to upgrade platform governance, support quality as in e-merchant, and foster a healthy and mutually beneficial environment***.

*And at the same time, we launched the 10 billion ecosystem earlier this year to support the high-quality merchants and other ecosystem partners doing business with us.    This is to provide the right kind of incentives to facilitate the high-quality development of the whole ecosystem*.    And at the same time, we are working very hard on improving our platform governance efforts, which is one of our top priorities since I took office.

53.    During the question and answer portion of the call, Defendant Zhao made the following statement about the effect of high-quality merchant relationships on revenue and profitability:

Although the industry players did not have any major promotions planned during Q3, we still practiced everyday low-price philosophy and worked hard to provide consumers with a wider selection of quality products at affordable prices.    And this is to deepen our cost savings value proposition.    And while we serve the basic needs of our consumers, *our cooperation with branded merchants also generated good results*.

[. . .]

And *we put in place the appropriate policies and offered platform resources to incentivize our merchants to work with us together on providing more savings and better services*. We are very pleased to see growing trust in our platform and higher user activities, which in turn provide more sales opportunities for the merchants, and merchants, in turn, are naturally more willing to increase the investment on our platform.

*We have been saying that revenue is a natural outcome of the value we create for our ecosystem partners*.    We will maintain our strategic direction and focus on the execution of the high-quality development strategy.    Instead of paying too much attention to short-term revenue trends, we will direct our attention to work on improving our core capabilities for serving the consumers and our merchants.

54.    During the question and answer portion of the call, Defendant Zhao denied reports that PDD platform applications have hidden functions that allow for extensive data exfiltration:

Our approach to competition has always been clear, which is we don't focus on what our competitors do, but what our consumers need.    We have been seeing a clear trend of consumption upgrade among our users.    And against this backdrop, we formulated the high-quality development strategy to better adapt to this trend.    The idea is very simple, but simple does not mean easy.

There is both healthy and malicious competition.    Sometimes competition can easily evolve into unhealthy market practices.    And those who do well will always attract attacks.    And for example, we noted a short-tail report on our company was issued in early September.    *The allegations in the report are totally baseless* and a short sale had a spotty track record.    And on this page, *the report was published with the intent to create panic*

*and to drive down stock prices and enabling the firm to -- the short seller to profit from short revision*.

55.     On February 9, 2024, CNBC published an article entitled "Temu returns to Super Bowl ad slate as lawmaker ire swells."   This article discussed a growing backlash to Temu from American lawmakers due to lack of compliance with the UFLPA.   CNBC quoted a Temu spokesperson as saying that Temu's standards and practicing surrounding the use of forced labor are "no different" from major e-commerce companies such as "Amazon, eBay, and Etsy" and that allegations against Temu are "completely ungrounded."   The CNBC article further quoted the spokesperson as saying the following:

> Before setting up their stores and listing products on Temu, every seller has to sign an agreement.   This document stands as a pledge to maintain lawful and compliant business operations, and adhere strictly to the legal standards and regulations of their specific markets[.]
>
> **The use of forced, penal, or child labor is strictly prohibited**.   Employment by all our merchants and suppliers must be strictly voluntary.   They shall respect the freedom of association and workers' rights to collectively bargain.   Temu's merchants suppliers, and other parties must pay their employees and contractors on time and must comply with all applicable local wage and hours laws.

56.     On February 12, 2024 Fox Business published an article entitled "Temu's Super Bowl ads spark backlash over China-based firm's forced labor allegations."   The article illustrated the increased attention from American lawmakers on Temu and PDD, stating the following:

> Fast fashion retailer Temu's Super Bowl ads drew the ire of lawmakers in Congress over the China-based company's links to products made with the use of forced labor in Xinjiang as well as its data-sharing policies.
>
> Members of Congress took to social media to call out Temu's data practices and links to forced labor in China as they sought to advise American consumers against downloading the app.
>
> [ . . . ]
>
> Rep. Michelle Steel, R-Calif., who is a member of the House Select Committee on Strategic Competition between the U.S. and the Chinese Communist Party, wrote: "It's Super Bowl Sunday! While you're watching this game, keep an eye out for ads from Temu,

a company profiting from CCP slave labor. This company should not be allowed to profit by manipulating American consumers."

Chairman of the House Select Committee on the Strategic Competition between the U.S. and the Chinese Communist Party Mike Gallagher, R-Wisc., told FOX Business: "It's disappointing to see broadcasters turn a blind eye to Temu's comprehensive failure to prevent Uyghur forced labor in its supply chains. Companies complicit in the Uyghur genocide should have no place in primetime ad slots."

57. On March 5, 2024, the Financial Times published a documentary film on YouTube entitled "The rise of Pinduoduo and Temu: profits and secrets." This video quoted a Temu spokesperson as saying the following in response to the discussion of allegations of forced labor:

Anyone doing business with Temu must strictly comply with all regulatory standards and compliance requirements[.]

We strictly prohibit the use of forced, penal, or child labour[.]

***Allegations in this regard are completely ungrounded***.

58. On March 20, 2024, PDD held a conference call to discuss its financial results for the fourth quarter and 2023 fiscal year. In opening remarks, Defendant Chen made the following statement about the effect of high-quality merchant relationships on revenue and profitability:

2023 was an important year for PDD Holdings. We began a journey dedicated to high-quality development. Aligned with our strategy, ***we rolled out a series of initiatives to empower businesses and enhance consumer value. This effort has resonated well with our users and merchants, learning their positive feedback and support***. Driven by a rebounding consumer market, our total revenue in the fourth quarter was RMB88.9 billion, which represents a 123% year-on-year increase. GAAP net income for this quarter was RMB23.3 billion. Over the past year, our revenue was RMB247.6 billion, which represents a 90% year-on-year increase.

59. In opening remarks, Defendant Zhou made the following statement about the effect of high-quality merchant relationships on revenue and profitability:

***These numbers also show that the growth of our platform is the result of the value we create for our consumers and merchants***. 2024 will be a year of consumption promotion. As always, guided by the principle of Consumer First, we will continue to improve the variety of products and services offered on our platform, deepen our value for money mindshare, upgrade our shopping experience and enhance user activity. And as a

result, ***we will be able to offer more visibility and sales opportunities for quality merchants, thereby strengthening the positive feedback on our platform***.

60.    During the question and answer portion of the call, Defendant Zhou made the following statement about the effect of high-quality merchant relationships on revenue and profitability:

> And from the supply side, we leverage our technology and scale to provide differentiated services for our SME merchants.   And through these services, we help SME merchants expand their market reach, and at the same time, broadening the product selection available on our platform.   And by doing so, we create a virtuous cycle.
>
> ***And looking ahead, we will continue to invest firmly and patiently to create long-term value for our consumers and merchants***, and also to build a solid foundation for the next phase of our journey.

61.    On April 25, 2024, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2023 (the "2023 Annual Report").   Attached to the 2023 Annual Report were signed certifications pursuant SOX signed by Defendants Chen and Liu  attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

62.    The 2023 Annual Report Annual Report contained the following risk disclosure about the Company's brand and reputation:

> ***Any harm to our brands or reputation may materially and adversely affect our business and results of operations.***   [Emphasis in original.]
>
> We believe that the recognition and reputation of our brands, including Pinduoduo and Temu, among our buyers, merchants and third-party service providers have contributed significantly to the growth and success of our business.   Maintaining and enhancing the recognition and reputation of our brands are critical to our business and competitiveness.
>
> Many factors, some of which are beyond our control, are important to maintaining and enhancing our brands.   These factors include our ability to:
>
> [. . .]
>
> • preserve our reputation and goodwill in the event of any negative publicity on our consumer experience or merchant service, ***internet and data security***, product

24

quality, price or authenticity, performance measures, or other issues affecting us or other e-commerce businesses in the countries or regions where we have operations.

63.    The 2023 Annual Report contained the following risk disclosure about the improper use of data:

***Our business generates and processes a large amount of data, and we are required to comply with laws relating to privacy and cybersecurity.    The improper use or disclosure of data could have a material and adverse effect on our business and prospects.*** [Emphasis in original.]

Our business generates and processes a large amount of data.    We face a number of challenges relating to data from transactions and other activities on our platforms, including:

- protecting the data in and hosted on our system, including against attacks on our system ***by outside parties or fraudulent behavior or improper use by our employees***, and securely transmitting such data over public networks;

- addressing concerns related to privacy, sharing, safety, security and other factors; and

- ***complying with applicable laws and regulations relating to the collection, use, storage, transfer, disclosure and security of personal data***, including any requests from regulatory and government authorities relating to these data.

To address these challenges, we have adopted strict security policies and measures, including encryption technology, to protect our proprietary data and buyer information. ***Maintaining complete security on our platforms and systems for the storage and transmission of confidential or private data, such as buyers' personal information, payment-related information and transaction information, is essential to maintaining consumer confidence in our platforms and systems.***

[. . . ]

***Any negative publicity on our platforms' data safety or privacy protection mechanisms and policies, and any claims asserted or investigations against us or fines imposed upon us as a result of actual or perceived failures, could have a material and adverse effect on our public image, reputation, financial condition and results of operations.***    Any compromise of our information security or the information security measures of our contracted third-party payment service providers that results in data being improperly used or disclosed could also materially and adversely affect us.    Significant capital, managerial and other resources, including costs incurred to deploy additional personnel, develop network protection technologies, train employees, and engage third-party experts and consultants, may be required to ensure and enhance information security or to address the issues caused by a potential security failure.

64.     The 2023 Annual Report contained the following risk disclosure about legal risk

relating to data privacy:

> ***Our business is subject to complex and evolving laws and regulations regarding privacy and data protection in the countries and regions where we have operations. These laws and regulations can be complex and stringent, and many are subject to change and evolving interpretation, which may result in claims, changes to our data and other business practices, regulatory investigations, penalties, or otherwise affect our business.*** [Emphasis in original.]
>
> Regulatory authorities around the world have adopted laws and regulations or are considering legislative and regulatory proposals concerning privacy and data protection, including in the PRC, U.S. and the European Union. These laws and regulations regulate the way we collect, use, store, transfer, disclose and secure data and protect the privacy of our users. Global developments in these laws may also create additional compliance obligations for us in the jurisdictions in which we operate.
>
> [...]
>
> Aspects of certain newly enacted state privacy statutes remain unclear, resulting in further legal uncertainty and potentially requiring us to modify our data practices and policies and to incur substantial additional costs and expenses to comply. ***If more stringent privacy legislation arises in the United States, it could increase our potential liability and adversely affect our business, results of operations, and financial condition.***
>
> [...]***Complying with these laws and contractual or other obligations relating to privacy, data protection, data transfers, data localization, or information security may require us to incur substantial operational costs or modify our data practices and policies.*** We have taken and will continue to take reasonable measures to comply with such laws and regulations, including those set forth under "Item 4. Information on the Company—B. Business Overview—Data Security and Protection" and "Item 16K. Cybersecurity." ***However, there are uncertainties with respect to how such laws and regulations will be implemented and interpreted in practice. Complying with applicable laws and regulations relating to data security and personal information protection may be costly and result in additional expenses to us, and any material failure to do so may subject us to potential liability, regulatory investigations, costly litigation or negative publicity, harm our reputation and business operations, significantly limit or completely hinder our ability to continue to offer securities to investors, or cause the value of such securities to significantly decline.***

65.     The 2023 Annual Report contained the following risk disclosure about scrutiny of

the Company:

> ***We may increasingly become a target of public scrutiny and anti-competitive actions conducted by competitors or third parties with ill intent, including complaints to***

***regulatory agencies, negative media coverage, and public dissemination of malicious reports or accusations about our business, all of which could severely damage our reputation and materially and adversely affect our business and prospects.*** [Emphasis in original.]

We process an extremely large number of transactions on a daily basis on our platforms, ***and the high volume of transactions taking place on our platforms as well as publicity about our business create the possibility of heightened attention from the public, competitors, regulators and the media.*** Heightened regulatory and public concerns over consumer protection and consumer safety issues may subject us to additional legal and social responsibilities and increased scrutiny and negative publicity over these issues, ***due to the large number of transactions that take place on our platform and the increasing scope of our overall business operations.*** In addition, changes in our services or policies have resulted or could result in objections by the public, our competitors, operators of traditional or new media and social networks, merchants on our platform or others. From time to time, these objections or allegations, regardless of their veracity, may result in consumer dissatisfaction, public protests or negative publicity, which could result in government inquiry or substantial harm to our brand, reputation and operations.

66.     The 2023 Annual Report contained the following risk disclosure regarding

international trade policies:

***Changes in U.S. and international trade policies, escalations of tensions in international relations, and increased scrutiny from customs and other authorities, may adversely impact our business and operating results.*** [Emphasis in original.]

There have been heightened tensions in international relations in recent years, which has resulted in and may continue to cause changes in international trade policies and additional barriers to trade. Countries impose, modify, and remove tariffs and other trade restrictions in response to a diverse array of factors, including global and national economic and political conditions, which make it difficult to predict future developments regarding tariffs and other trade restrictions.

67.     The 2023 Annual Report contained the following risk disclosure about legal

compliance:

***Our business is subject to a large number of laws across many jurisdictions, many of which are evolving.*** [Emphasis in original.]

[. . .]

***We strive to comply with all laws and regulations that are applicable to our operations around the world***. Despite our efforts, we may not have fully complied in the past, and may not be able to fully or timely comply in the future, with all applicable laws and regulations, particularly where the regulatory regimes have not been broadly applied to e-

27

commerce platforms. . . . . ***Additionally, if the third-party merchants that sell merchandise on our platforms or the third-party vendors that provide services to us violate applicable laws or regulations, those violations could also result in liabilities for us and harm our brands, reputation and business. For example, in June 2022, the Uyghur Forced Labor Prevention Act, or the UFLPA, became effective in the U.S., establishing a rebuttable presumption that goods mined, produced, or manufactured in a certain region in China or by an entity on the UFLPA Entity List are prohibited from importation into the U.S. We require merchants on the Temu platform to comply with our third-party code of conduct, which strictly prohibits the use of forced, penal or child labor. In addition, we establish policies and procedures to ensure that no seller on the Temu platform is on the UFLPA Entity List, and use technology to identify products that are at higher risk of non-compliance.***

68. On May 22, 2024, PDD held a conference call to discuss its financial results for the first quarter of 2024. In opening remarks, Defendant Zhou made the following statement about the effect of high-quality merchant relationships on revenue and profitability:

This year is a year for consumption promotion. The consumer market in the first quarter has made a good start. Online consumption remains strong and online retail penetration continues to rise. ***We proactively responded to the consumption promotion policies and launched a series of promotional activities to meet users' shopping needs during the spring festival and other seasonal events. This further relieved consumption potential and benefits merchants***.

[. . . ]

On the supply side, ***we continue our investment to support and grow together with the brands and merchants***. In the first quarter, we focused on the theme of trending national brands and allocated platform resources such as traffic support to high-quality merchants. ***This not only ensures the high-quality supply but it also help boost our merchants' businesses***.

[. . . ]

***Our high-quality development strategy is a long-term, massive and complex project. We will bring together the efforts and resources from all ecosystem participants to deepen our execution and create more value for our consumers and merchants.***

69. During the question and answer portion of the call, Defendant Liu made the following statement about the effect of high-quality merchant relationships on revenue and profitability:

From the merchant side, we are also improving the scope and value of our services. *We continue to allocate resources to support high-quality merchants who are willing to do business properly*. By doing so, we hope to grow together with the merchants and further broaden the selection of quality production of our platform. A positive feedback loop is achieved when these factors work together. In such a rising industry, we need to keep our heads down and focus on execution. Faced with more competition, our constant focus is to deliver more value for our consumers and merchants. *We believe that the value we create for consumers and merchants will ultimately be reflected in our financial results*.

70.     During the question and answer portion of the call, Defendant Chen made the following statement about the effect of high-quality merchant relationships on revenue and profitability:

Looking ahead, we will continue to focus on enhancing our supply chain capabilities, our service capabilities and compliance capabilities. And in terms of supply chain, *our goal is to further extend and deepen our supply chain to connect with high-quality merchants and high-quality suppliers around the world and to further broaden the product offerings on our platforms. And at the same time, we'll improve the efficiency of the supply chain to make it easier for merchants to sell their products and also to lower their cost of doing business*. And therefore we can -- all consumers and merchants worldwide will be able to benefit from this.

71.     The statements contained in ¶¶ 40-70 were materially false and/or misleading because they touted PDD's growth while concealing several factors that rendered this growth unsustainable and posed substantial risks to PDD's business, including:

(a)     merchant policies that made it unprofitable for vendors to do business on PDD platforms while allowing PDD to grow revenues and save on operational costs;

(b)     malware issues on PDD applications that exploited customers and obtained user data without consent, including accessing sensitive information;

(c)     PDD's failure to implement effective compliance systems, including a system to prevent goods made by forced labor from being sold on its platform;

(d)      that, due to the foregoing, PDD faced an undisclosed risk of poor merchant and customer relations as the platforms scaled, which ultimately led to hundreds of millions of dollars in fees returned to merchants and merchants defecting to competing sites.

### THE TRUTH CONTINUES TO EMERGE

72.      On July 30, 2024, media reported that hundreds of merchants had begun protesting at PDD's office in southern China.    According to *Bloomberg*, the "protest was the culmination of growing frustration among merchants and third-party sellers, who feel PDD is increasingly squeezing them for revenue . . . .    Their complaints center on PDD's practice of withholding payments to merchants who're judged to have fallen short on customer expectations."

73.      On this news, the price of PDD ADSs fell $4.43, or 3.47%, to close at $123.16 on July 30, 2024.    However, the extent of the risk of PDD's poor merchant relations had yet to be fully revealed.

74.      Defendants' fraud was more fully revealed on August 26, 2024 when PDD disclosed its quarterly results for the second quarter of 2024.    PDD reported fiscal second-quarter 2024 revenue growth of 86% year-over-year to $13.36 billion, missing the analyst consensus estimate of $13.97 billion.

75.      In a press release issued the same day, Defendant Chen stated that "While encouraged by the solid progress we made in the past few quarters, we see many challenges ahead."

76.      In the same press release, Defendant Liu stated that "In the past quarter, our revenue growth rate slowed quarter-on-quarter.    Looking ahead, revenue growth will inevitably face pressure due to intensified competition and external challenges.    Profitability will also likely be impacted as we continue to invest resolutely."

77.     PDD further announced that it had decided not to issue dividends or repurchase shares for the "foreseeable years ahead," and stated that it expects that future profitability will be weighed down by a reduction in transaction fees for high quality merchants to drive the "high-quality development" of its merchant ecosystem.

78.     On a related earnings call, Defendant Chen stated that the Company would need to "improve our capabilities in supply chain, customer services and compliance to better meet the expectations of consumers around the world."    On the same earnings call, Defendants Zhao stated that PDD "invested heavily in developing comprehensive user friendly training materials for merchants to boost their compliance capabilities."

79.     On this news, the price of PDD ADSs fell $39.87, or 29 percent, to close at $100.00 on August 26, 2024.

80.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

81.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

82.    The Individual Defendants permitted PDD to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's securities.

83.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding PDD, their control over, receipt, and/or modification of PDD's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning PDD, participated in the fraudulent scheme alleged herein.

84.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of PDD securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding PDD's business, operations, and management and the intrinsic value of PDD securities and caused Plaintiff and members of the Class to purchase PDD securities at artificially inflated prices.

## LOSS CAUSATION AND ECONOMIC LOSS

85.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of PDD's securities and operated as a fraud or deceit on Class Period purchasers of PDD's securities by materially misleading the investing public.   Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of PDD's securities materially declined, as the prior artificial inflation came out of the price over time.   As a result of their purchases of PDD's securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

**NO SAFE HARBOR**

86.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of PDD who knew that the statement was false when made.

**Presumption of Reliance; Fraud-On-The-Market**

87.     At all relevant times, the market for PDD's securities was an efficient market for the following reasons, among others:

> (a)     PDD's securities met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

> (b)     PDD communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging

public disclosures, such as communications with the financial press and other similar reporting services;

(c)    PDD was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about PDD was reflected in and incorporated into the Company's securities prices during the Class Period.

88.    As a result of the foregoing, the market for PDD's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in PDD's securities price. Under these circumstances, all purchasers of PDD's securities during the Class Period suffered similar injury through their purchase of PDD's securities at artificially inflated prices, and a presumption of reliance applies.

89.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## CLASS ACTION ALLEGATIONS

90.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the Company's securities publicly traded on NASDAQ during the Class Period, and who

were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

91. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PDD's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

92. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

93. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

94. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of PDD;

(c)        whether the Individual Defendants caused PDD to issue false and misleading financial statements during the Class Period;

(d)        whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)        whether the prices of PDD securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)        whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

95.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

96.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

97.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

98.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or

deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

99.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

      (a)     employed devices, schemes and artifices to defraud;

      (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

100.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.   These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

101.     Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above,

and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiff and the Class.

102.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period.     In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

103.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

104.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

105.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

106.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1-95 as if fully set forth herein.

107.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.    Because of their senior positions, they knew the adverse non-public information about the Company's business practices.

108.     As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

109.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations.    Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.    The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.    In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

110.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 30, 2024

**LABATON KELLER SUCHAROW LLP**

/s/ Francis P. McConville
Eric J. Belfi
Francis P. McConville
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
ebelfi@labaton.com
fmcconville@labaton.com

*Counsel for Plaintiff and the Proposed Class*

**VANOVERBEKE MICHAUD & TIMMONY P.C.**
Aaron L. Castle
79 Alfred Street

Detroit, Michigan 48201
Tel: (313) 578-1200
Fax: (313) 578-1201
acastle@vmtlaw.com

*Additional Counsel for Plaintiff*

## <u>CERTIFICATION</u>

I, Harold Haugh, as Chairman of Macomb County Retiree Health Care Fund ("Macomb County RHC"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Macomb County RHC.  I have reviewed a complaint prepared against PDD Holdings Inc. ("PDD" or the "Company") alleging violations of the federal securities laws and authorize the filing of this pleading;

2.      Macomb County RHC did not purchase PDD securities at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Macomb County RHC is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  Macomb County RHC fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      Macomb County RHC's transactions in PDD securities during the Class Period are reflected in Exhibit A, attached hereto;

5.      Macomb County RHC sought to serve or currently serves as a lead plaintiff or representative party in the following class actions under the federal securities laws filed during the last three years:

*Schaeffer v. Signature Bank,* No. 1:23-cv-1921 (E.D.N.Y.)
*Kangas v. Illumina, Inc.,* No. 3:23-cv-2082 (S.D. Cal.)
*McAlice v. The Estee Lauder Companies Inc.*, No. 1:23-cv-10669 (S.D.N.Y.)
*Cleveland Bakers and Teamsters Pension Fund v. Lamb Weston Holdings, Inc.*, No. 1:24-cv-00282 (D. Idaho)

6.      Beyond its pro rata share of any recovery, Macomb County RHC will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the

reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this **27th** day of September, 2024.

DocuSigned by:

*Harold Haugh*

FFB48D567314437...

Harold Haugh
Chairman
Macomb County Retiree Health Care Fund

**EXHIBIT A**

**TRANSACTIONS IN PDD HOLDINGS INC. SECURITIES**

| Transaction Type | Trade Date | Number of ADSs | Share Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchases | 07/02/21 | 55 | $119.20 | ($6,556) |
| Sales | 06/24/22 | (125) | $65.96 | $8,245 |
| Purchases | 07/11/22 | 200 | $53.82 | ($10,765) |
| Sales | 02/02/23 | (100) | $99.61 | $9,961 |
| Purchases | 12/01/23 | 190 | $145.27 | ($27,601) |